I8OHMakS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          17 Cr. 350 (KBF)

LEVAN MAKASHVILI,

                                        Sentence
            Defendant.

------------------------------x

                                        New York, N.Y.
                                        August 24, 2018
                                        12:30 p.m.


Before:

                HON. KATHERINE B. FORREST,

                                        District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ANDREW M. THOMAS
ANDREW ADAMS
     Assistant United States Attorneys

XAVIER R. DONALDSON
     Attorney for Defendant

ALSO PRESENT:   LASHA GEGECHKORI, Interpreter (Georgian)

I8OHMakS

1          (Case called)

2          MR. THOMAS:  Good afternoon.  Andrew Thomas and Andrew

3    Adams, for the United States.

4          THE COURT:  All right.  Good afternoon, both of you.

5          MR. DONALDSON:  Your Honor, Xavier R. Donaldson, for

6    Mr. Makashvili.  Good afternoon.

7          Good afternoon, government.

8          THE COURT:  Good afternoon, Mr. Donaldson.

9          The Court notes Mr. Makashvili is here and present.

10   Good afternoon, sir.

11         All right.  I see that the defendant is wearing the

12   equipment that allows him to hear the interpreter.  If at any

13   point in time you cannot hear the interpretation, just let me

14   know or let Mr. Donaldson know, but if you don't say anything

15   that indicates that you don't hear, we'll assume that you're

16   able to hear everything.  All right?

17         THE DEFENDANT:  (In English) Yes.

18         THE COURT:  All right.  Thank you.

19         I apologize for keeping you folks waiting.  We had a

20   little miscommunication in chambers about whether this was

21   going to be at 1:00 or at noon.  I was downstairs, not knowing

22   I should have been upstairs.  So it's my fault, and so I

23   apologize for that.

24         Let me start by setting forth for you folks the

25   materials that we have in connection with this proceeding, and

I8OHMakS

1    we'll take it from there.

2            The crime of conviction is traveling in interstate and

3    foreign commerce with the intent to promote, manage, establish,

4    carry on, and facilitate a business enterprise involving

5    gambling.  And there is a maximum five-year term of

6    imprisonment that could be imposed on any individual convicted

7    of that crime.

8            I've received in connection with this proceeding also

9    a defense submission that is dated August 19, 2018.  It was

10   filed the next day, but is signed August 19.

11           I have also received in connection with this

12   proceeding a presentence investigation report that is revised

13   as of July 25, 2018.

14           And then separately and what gave rise, in part, to my

15   order of yesterday was I received on August 21 from Pretrial

16   Services notification that the defendant has violated the terms

17   of his bail, at least purportedly, and had been arrested on

18   July -- I'm sorry, August 12, and then notified -- he notified

19   pretrial the next day on August 13 that he'd been arrested.  As

20   I understand it, the arrest was for a couple of things.  But in

21   part, he was stopped for a traffic violation, and it turned out

22   he was both driving with a suspended license and also there was

23   a stolen, or at least purportedly stolen, license plate on the

24   vehicle he was in.  I don't take the report as indicating that

25   the vehicle was stolen but that the plate was stolen.  So I

I8OHMakS

1    have this report also.

2              As I understand it, based upon an email to chambers, I

3    believe everybody has received a copy of this report.  If

4    people have not, then I'm happy to hand around the copy that I

5    have.  Otherwise, I'll assume you're all aware of it.

6              I have not received in connection with this sentencing

7    any submission from the government, and so I wanted to first

8    confirm, Mr. Thomas, that's correct?

9              MR. THOMAS:  That's correct, your Honor.  Yesterday

10   the government filed a letter indicating that it would not be

11   filing a formal submission in this case.

12             THE COURT:  All right.  Is there anything else that

13   you folks think I should have?

14             MR. DONALDSON:  No, your Honor.

15             Yes, we did receive the Pretrial Services memorandum,

16   I believe the same time the Court did.  I think I did.

17             THE COURT:  OK.

18             MR. DONALDSON:  22nd -- 23rd.

19             THE COURT:  All right.  So we've all got, then, the

20   same set of materials.

21             MR. DONALDSON:  Yes.

22             THE COURT:  Mr. Donaldson, have you had an opportunity

23   to review the PSR with your client?

24             MR. DONALDSON:  Yes, I have, your Honor.

25             THE COURT:  Do you or your client have any objections

I8OHMakS

```
1    to or modifications that need to be made to the PSR?

2             MR. DONALDSON:  None except we did -- and I spoke to

3    the government about this again this morning -- in our

4    submission to the Court, we did put regarding the security

5    aspect of the allegation itself, I believe the report says he

6    acted as muscle, or something to that effect.  Again, I haven't

7    talked to the government about this for quite some time over

8    the last year or 14 months.  We didn't like the word "muscle,"

9    that he was portrayed as being the muscle or one of the muscle

10   for Mr. Shulaya, so I just wanted to make that kind of passive,

11   call it passive, objection.

12             We do note and acknowledge, as I told the government,

13   that he was present on several occasions when Mr. Shulaya was

14   with who we knew to be muscle.  We do know that he was there on

15   some of those occasions.  I just did not have any information

16   whatsoever that he participated or, for lack of a better term,

17   flexed to anybody that he was here to protect Shulaya or

18   anything like that.

19             So I just wanted to note that as passively as

20   possible.  I just didn't have that specific information.

21             THE COURT:  Let me just ask, is there anything you

22   would like -- I hear the point.  I think that the evidence at

23   the Shulaya trial appeared to indicate that there were

24   individuals often who were associated either with the fighting

25   community or MMA who would be present with Shulaya and that it
```

I8OHMakS

may be that the individual, Mr. Makashvili, was not himself

intending to provide muscle, but that there was a presence of

these individuals with this particular skill set in the

vicinity of Mr. Shulaya.

        MR. DONALDSON:  Right.

        THE COURT:  I think that is really the purpose for

which it's being used.  There's no indication in the materials

before me that Mr. Makashvili committed or perpetrated any

violence.

        MR. DONALDSON:  Right.  I did read the trial, the

2,000 or so pages that were a very entertaining trial.  I might

add I did read that just to make sure that didn't happen.  So I

agree with the Court.  That's, I think, how it was.

        THE COURT:  So do you want me to take the phrase "as

muscle" out?

        MR. DONALDSON:  Yes, I'd prefer that.

        THE COURT:  Mr. Thomas, does the government have any

objection to that?

        MR. THOMAS:  As we communicated to Mr. Donaldson, we

don't have an objection to rewording or omitting that

particular word.  I think the point which the Court has already

taken is that Mr. Makashvili formed part of an entourage of

fighters that Mr. Shulaya used to signal his status and

capacity for physical retaliation.  The government makes no

allegation that Mr. Makashvili committed any acts of violence

I8OHMakS

1   or was, in fact, used in the way in which Mr. Donaldson, I

2   think, is concerned.  But I think the government's position,

3   and that is reflected by the trial evidence, is that

4   Mr. Makashvili was one of many who performed a signaling

5   function.

6              THE COURT:  Why don't we see if this works.

7   Paragraph 9 would be changed to say, "Levan Makashvilli is a

8   professional MMA fighter and served the Shulaya enterprise,"

9   insert "as part of Mr. Shulaya's entourage, and as a driver,"

10  and strike the phrase "as muscle and." So the word "muscle" was

11  out.  He was just there and present.

12             MR. DONALDSON:  I'll take that, your Honor.  Yes.

13             THE COURT:  Mr. Thomas, is that acceptable to you?

14             MR. THOMAS:  It is, your Honor.

15             THE COURT:  So that will be a change, Chris, which

16  needs to be noted on a blue card in the PSR for paragraph 9,

17  and so then probation would then prepare a revised PSR that

18  would then go onto the docket reflecting the blue card.  All

19  right.

20             Other than that, Mr. Donaldson, do you have any

21  changes or modifications to the factual statements in the PSR?

22             MR. DONALDSON:  I do not, your Honor.

23             THE COURT:  Does your client have any additional

24  changes or modifications to the factual statements in the PSR?

25             MR. DONALDSON:  After speaking to him again yesterday,

I8OHMakS

1    he does not.

2              THE COURT:  Mr. Thomas, does the government have any

3    additional -- any changes or modifications to the PSR?

4              MR. THOMAS:  No, your Honor.

5              THE COURT:  The Court then does adopt the factual

6    statements in the PSR.  The PSR will be made part of the record

7    in this matter and filed under seal.  If an appeal is taken,

8    then counsel on any appeal may have access to the PSR without

9    any need for further application to the Court.

10             Let's turn to the guidelines.  The guidelines in the

11   PSR are reflected as an offense level of eight and a criminal

12   history category of I.  That is the same as the offense level

13   and criminal history category that the parties indicated in the

14   plea agreement.  And based upon the information currently

15   available to me, that appears to be the correct calculation.

16             Does anyone have any comment on the guidelines?

17   Otherwise, I'll confirm them as eight and I.

18             MR. THOMAS:  No comment, your Honor.

19             MR. DONALDSON:  No comment, your Honor.

20             THE COURT:  So the guidelines are offense level eight,

21   criminal history category as I.

22             OK, folks.  Let's turn to the next portion of the

23   proceeding, and let me just introduce this very briefly with a

24   little bit of a further explanation to my order of yesterday

25   which indicated that I was considering an incarceratory

I8OHMakS

1    sentence.  Let me tell you why.

2              I am very concerned about the recent arrest of the

3    defendant, and it appears to indicate to me, particularly since

4    this was the period of time while he was just weeks away from

5    sentencing in this matter and after a serious trial that had

6    already occurred with codefendants and all of the information

7    that had become known, that that series of events appeared to

8    indicate a lack of appreciation for the seriousness of the

9    conduct and a need, frankly, for a sentence that indicated that

10   the Court took things seriously and that there was a need for

11   personal deterrence and that a probationary sentence did not

12   appear to achieve that, given the fact that the defendant's

13   driving around in a vehicle with stolen plates, with a

14   suspended license two weeks before he's to be sentenced for a

15   felony.  So that is why I issued the order that I did, and so

16   you folks should fold that into your comments.

17             But from my perspective, it is a 3553(a)

18   consideration.  Obviously, the conduct, he's not being

19   sentenced for that other state conduct.  It's just a 3553(a)

20   consideration in terms of the need for personal deterrence and,

21   really, his personal characteristics.  So fold that into

22   whatever you'd like to say, but that gives you a little bit

23   more information about why the order that was issued, issued.

24             Mr. Thomas, with that said, why don't you go ahead and

25   proceed, sir.

I8OHMakS

1          MR. THOMAS:  Yes, your Honor.  I'll start first by

2     focusing on the defendant's conduct in the charged case.  It's

3     the government's perspective that a sentence within the zero to

4     six-month range would be appropriate in terms of imprisonment.

5          Mr. Makashvili at the time the case was taken down and

6     the arrest occurred and some initial presentations were made to

7     the Court was thought to have been all over a number of

8     telephones with communications, most notably, to Mr. Shulaya

9     talking about a range of criminal conduct.  In the course of

10    the investigation that followed even the takedown, what we

11    discovered is that we had been -- we had mistaken that all of

12    those phones were Mr. Makashvili's himself.  It was, in fact,

13    the case that Mr. Makashvili had used his name for a number of

14    telephones that were distributed to a number of fighters, and

15    so only a portion of the conversations that we had intercepted

16    were Mr. Makashvili, although the sort of registration

17    information on a number of those telephones came back to him.

18          That led us to sort of recontextualize Mr. Makashvili

19    in that where we end up is that Mr. Makashvili really is a

20    minor person who supports the Shulaya enterprise.  He supported

21    it by providing those telephones.  He supported it, as he

22    explained in his factual allocution, by driving Mr. Shulaya

23    around, knowing that the purpose of the drives was to enable

24    Mr. Shulaya to attend to the gambling business and then most

25    notably, as was focused at the trial, by accompanying Shulaya

I8OHMakS

1    and others when he travels west to LA to meet with the LA four,

2    and it's out in LA that Mr. Makashvili is standing shoulder to

3    shoulder with Shulaya as part of the entourage to signal that

4    Mr. Shulaya, from the East Coast, you know, he's an important

5    person and to be respected on the West Coast in this

6    conversation with Mr. Kazarian.

7            So from the Court's perspective, perhaps one of the

8    things to focus on at sentencing is not so much the specific

9    acts individually that Mr. Makashvili has undertaken, but

10   rather that he formed part, again, of this enterprise and

11   signaled that it was something desirable, that it had form and

12   force, and that Mr. Shulaya was somebody to be respected and

13   feared.  So from the government's perspective, there is at

14   least a particular general deterrence value.

15           THE COURT:  Let me just ask you, in terms of that,

16   what is the period of time that you understand Mr. Makashvili

17   functioned as a driver and/or was part of the entourage?  And I

18   ask that in part because -- and you can tell part of that

19   information from the phones and everything else -- but I want

20   to get a sense as to whether there were only two instances of

21   him driving Mr. Shulaya around or whether it was expected that

22   that there were a number.

23           MR. THOMAS:  One moment, your Honor.

24           (Counsel confer)

25           MR. THOMAS:  Your Honor, the agents may come forward

1    and correct me if I'm wrong, but I believe that Mr. Makashvili

2    is at least spotted and observed starting at the end of 2016.

3    He has international travel during the spring of 2017 that

4    removes him from the day-to-day operations, and then he returns

5    and rejoins the Shulaya enterprise when it heads to California.

6              THE COURT:  All right.

7              MR. THOMAS:  It extended over a period of months with

8    a break in which he's overseas.

9              THE COURT:  I would say, as you folks know from

10   paragraph 9 of the PSR, he's present at least as of May 2016,

11   not just the end of 2016.

12             MR. THOMAS:  That's right, your Honor.

13             THE COURT:  So it was sometime during 2016, 2017 with

14   a break where Mr. Makashvili was traveling internationally.

15             MR. THOMAS:  That's correct.

16             THE COURT:  Then he was arrested in June of 2017.

17             Anything else, Mr. Thomas?

18             MR. THOMAS:  Yes.  I wanted to comment, if I could,

19   about the report from Pretrial Services.  Since that report

20   came through, the government has been looking into the

21   circumstances.  And part of the reason why we haven't focused

22   on that in our sentencing submission or in our remarks now is

23   that we don't fully yet have context as to what exactly

24   happened.

25             We could tell the Court and I know Mr. Donaldson has

I8OHMakS

an explanation as for why Mr. Makashvili happened to be driving

that day, but the plate was stolen.  The vehicle appears to be

Mr. Makashvili's vehicle or vehicle that he uses.  What we have

learned is that that plate, it appears, was stolen from a

rental car company or off a rental car in Florida a few years

back.  Since the time it was stolen, the plate has been in New

York City for a while and used on a series of vehicles, but it

has only been used on the vehicle Mr. Makashvili was stopped in

since July.

          So I don't know.  We don't have an answer yet as to

whether Mr. Makashvili switched out the plates after his

license was suspended or whether there was some other more

nefarious purpose for switching plates on that vehicle, but it

appears that that stolen plate has been around New York City,

it's been on a series of vehicles, and only recently ended up

on Mr. Makashvili's vehicle.  That's the point where we arrived

in our investigation.

          THE COURT:  All right.  Mr. Donaldson.

          MR. DONALDSON:  Oh, I'm sorry.  Normally, I'll come

over here, so I'll come over here.

          I'll try to be brief, your Honor.  I tried to explain

a little bit in my sentencing submission that I would go

backwards starting with the recent, what I gather from the

Court and I understand from the Court's writing last night, is

a very serious matter.

1    I agree that any arrest is a serious matter.  I agree

2    with that.  And I do still do a lot of state court work, so I

3    appreciate the Court's attention to it.  I somewhat disagree

4    with whether or not it's of the manner or to the level that

5    would require going from probation, a probationary

6    consideration, to jail.  I'll go to my reasons why, but I think

7    I'm landing in that lane.

8         The reason is he was, in fact, stopped on August 12,

9    2018.  He did report it to probation, to his officer, the very

10   next day when he could.  So I think that is good on his part.

11   We should put in context why he was stopped, though.  From what

12   I understand, he was in Brooklyn, and he was going to take his

13   mother-in-law her medication.  She had just fainted, and so she

14   needed medication.  So he did tell me he was trying to get

15   there.  He was trying to get there because his mother had just

16   fallen and banged her head.  She's elderly.  He was trying to

17   get her medication, so he did that.  He did, in fact, get the

18   officers the medication.  They did, in fact, rush it over to

19   the mother-in-law because she was in need of it.  That's why he

20   was stopped.  I don't know if he said he ran a stop sign, but

21   he did acknowledge he was rushing to get there.  He did then at

22   that point find out his license was suspended.

23        Now, to that point, licenses, as the Court may know

24   and I'm sure the prosecutors know, in New York City, the way

25   licenses are suspended is that you get a summons; and then if

you don't answer the summons, they send you a suspension letter
to an address or to someplace, and that's their notice that you
are suspended.  Now, we've been arguing about that in New York
State court for quite some time about that should not be the
proper notice because sometimes people just don't get their
mail, or whatever.  So I don't believe and Mr. Makashvili has
informed me that he did not know his license was suspended,
which is why as soon as he found out, he got it reinstated the
next day or two days later on the 16th, three days later on the
16th.  So it's for, I believe, one summons.  From what I
understand, one summons that was issued.

            I told the prosecutors that normally when I have that
situation regarding that or a suspended licenses, I look back
to find out whether or not the person has been stopped or
something in between that, because then I would say, well, if
he knew his license was suspended and you stopped him before,
they would have given him the suspended license then.  In this
situation I asked the government, well, I didn't know when the
license plate supposedly got on the car because he got the
summons, and if he got a summons, if he didn't get arrested for
driving with a stolen plate, then that creates a conflict, in
my mind, because if he got a summons, that must mean some
police officers had to have seen the license plate.  I don't
know when he got the summons.  I thought it was sometime in
June.  I need to check that out.

I8OHMakS

1            The government has now told me, based upon their

2     investigation, and told the Court that the license plate was

3     stolen from Florida, or wherever it was stolen from, a year and

4     a half ago.  So we know Mr. Makashvili didn't steal a license

5     plate.  That's not the case.  We know that.  The question is

6     whether or not he knew he had a stolen license plate on his

7     vehicle.  I don't believe he knew that either.  I say that

8     because I've seen him drive the vehicle, and like I told the

9     government, unless he's plumb crazy to have a federal case and

10    drive his vehicle up to the federal courthouse knowing he has a

11    stolen plate on it.  That would be kind of silly.  And I think

12    common sense dictates that that means, in my mind, he didn't

13    know it was stolen.  Not saying that it wasn't stolen, not

14    saying he shouldn't have had it on there.  I grant all that.

15    But when I think about what the Court said, whether or not he's

16    not taking the Court seriously, taking this case seriously

17    enough to get arrested prior to -- two weeks prior to

18    sentencing, I just don't think, in my mind, that he knew -- no

19    one knows they're going to be arrested; two, I don't know that

20    he knew his license was suspended, nor do I think he knew he

21    had a stolen license plate.

22            So, in my opinion, I'm hoping that the Court doesn't

23    believe that he was driving around with that knowledge two

24    weeks before sentencing because he didn't care about that.

25    That's not the case.  I just don't think he knew about those

1    issues, and that's why it got resolved so quickly.

2              THE COURT:  Why would he have taken his license plate

3    off of his vehicle if he didn't know that his license had been

4    suspended?  In other words, we know that there was a plate on

5    his vehicle that was there when his license was suspended.  We

6    know that there is another plate on the vehicle within two

7    months.

8              MR. DONALDSON:  Well, license plates --

9              THE COURT:  People don't walk around swapping out

10   their plates --

11             MR. DONALDSON:  I agree.

12             THE COURT:  -- every day.

13             MR. DONALDSON:  I agree with that to a point.  I mean,

14   we can have --

15             THE COURT:  Most people.

16             MR. DONALDSON:  We can have a discussion about this

17   probably off the record so I won't get myself in trouble.  But,

18   yeah, I don't know if that's exactly true, Judge, with all due

19   respect.  Secondly, license plates and suspended license don't

20   go hand in hand.  You don't take off the license plate to

21   prevent yourself from getting -- you don't put a stolen license

22   plate on a car to prevent the police department from knowing

23   that you have a suspended license.

24             THE COURT:  No, I agree with that, but I'll --

25             MR. DONALDSON:  That would not make any sense.  I

1    don't think he swapped the license plate out so that the police

2    department wouldn't know he has a suspended license.  That

3    would make -- that just would be nonsensical.

4              THE COURT:  Let's put it this way:  There are

5    circumstances under which this gentleman put a license plate

6    that did not belong to him, and presumably since it was a

7    license plate from a rental car company in Florida, that it had

8    an uncertain provenance that he put onto a vehicle that he

9    drove.

10             MR. DONALDSON:  I think I will agree with the -- we

11   have to make some assumptions.  I'm going to just assume for

12   record purposes that he put the license plate on there.  I'm

13   going to assume for record purposes that -- well, it was a

14   Florida plate, but I just cannot and I cannot make the leap

15   that he put, knowingly put, a stolen license plate on his car

16   and drove around.  We just don't, in my experience, hold out

17   knowingly stolen goods.  Normally when you know something is

18   stolen, it's something that you can secret.

19             THE COURT:  You normally don't put somebody else's --

20   this is a Florida plate.

21             MR. DONALDSON:  I agree with that.

22             THE COURT:  It's not like a New York plate.

23             MR. DONALDSON:  I'm not disagreeing with that part.  I

24   think the part about putting a Florida plate on your car is

25   outright stupid, with all due respect to my client, but I just

I8OHMakS

1   don't and I'm not and I can't based, on my conversations with

2   him and with his manager, who is his wife, go so far as saying

3   that he knew that the car -- that the plate was stolen.  I

4   think that's where we separate.  I do think he made a colossal,

5   colossally -- is that a good word?  That's a bad word -- a very

6   large, dumb decision regarding putting a license plate on his

7   car.  I do not think he put the license plate on the car

8   knowing that the license plate was stolen.  That part I know he

9   didn't do.  So that's that.

10          But to that point, and I don't know that he did that,

11  saying that -- I don't know.  I'm sure he didn't do that saying

12  that he doesn't appreciate the seriousness of the case.  For

13  the last 14 months, he's expressed to me the seriousness of the

14  case and how much trouble he's in, and he's looking at jail

15  time and the Court can sentence anywhere from zero to five, at

16  that point zero to 20 years.  I don't want the Court to believe

17  or to think for one second --

18          THE COURT:  Zero to five years.

19          MR. DONALDSON:  Well, what I'm saying is, no, before

20  we negotiated this great plea, before that it was much more

21  than that.

22          THE COURT:  Yes.

23          MR. DONALDSON:  So he appreciated the seriousness of

24  the case for quite some time.  He appreciated the seriousness

25  of the case after we took the plea.  At that point, he's been

1   appreciating it since that time.  We talk a lot.  So I cannot

2   emphasize the fact that he does appreciate how serious the

3   matter is and in no uncertain terms because of the consequences

4   that follow from it and what can happen to him related to his

5   personal and professional experience.  Unlike, I think, anyone

6   else, you know, he -- when I say he has been actively and

7   begging me almost every week how he could get back fighting,

8   because that's all he knows, and he knows that this is going to

9   play a large part in doing that.  So that's why I'm saying I

10   cannot imagine he would be doing anything that would

11   intentionally try to mess that up.  That just is the farthest

12   thing from his mind.

13          So this, what happened the last two weeks, I don't

14   think was because he has no respect for the process or he

15   doesn't know how serious it is, but I think it's more one of,

16   maybe even before that, several pretty poor decisions, not

17   anything criminal in mind, but just a significantly poor

18   decision that I don't think should result in a consideration

19   from probation for jail time.

20          As far as the 3553 factors, I agree it does go towards

21   that.  The Court should use all that it should regarding

22   Mr. Makashvili's character, etc., regarding the sentence, but I

23   think to that end, 3553 and its analysis weighs heavily, I

24   mean, I think very heavily towards a non-incarceratory

25   sentence.  If I could have an opportunity, I'll just say

1    briefly why.

2            I looked at the PSR pretty carefully, and what I was

3    struck by was page 23 where it talks about voluntary surrender.

4    One of the things that I like noting is what other people think

5    and, of course, the courts think about why people should get

6    sentenced.  Here, the last sentence where it states that

7    Mr. Makashvili is not viewed as a flight risk or a danger to

8    the community, why is that important?  It's important because

9    the probation department believes, of course that he's not a

10   flight risk, but more importantly they believe he's not a

11   danger to the community.  Why is that important to me?  Because

12   I firmly believe that jail, prison, any type of custodial

13   process should be reserved for those persons that are, in fact,

14   somehow dangerous to the community or could be or was or

15   committed some act that we believe, as a society, he should be

16   taken from society for a while.  Mr. Makashvili simply does not

17   present that in any way, shape, or form.

18           I also would like to, if I can, look at page 20 of the

19   PSR.  Page 20 where the probation department indicates, and

20   I'll read for the record:  "Based upon Mr. Makashvili's

21   first-time offender status and minor role in the offense, we

22   view a custodial sentence as unnecessary and believe a sentence

23   of probation sufficiently addresses the sentencing factors set

24   forth in 18 U.S.C. 3553, most significantly, just punishment."

25           I agree wholeheartedly with that.  Why do I agree

1    wholeheartedly with that?  For the reasons set forth in my

2    sentencing memorandum.  One second.

3              For example, as indicated, Mr. Makashvili was not a

4    leader, organizer, supervisor, or manager of this conspiracy.

5    He was considered a minor participant.  He is not alleged to

6    have committed any violence related to or in furtherance of

7    this federal conduct.  This was his first contact of any kind

8    with law enforcement.  He does not have a significant role in

9    this conspiracy.  He has maintained gainful employment,

10   significantly provides for his two children, has family support

11   and community support.  Outside this criminal conduct, he's

12   maintained a structured, productive life.  Why do I say

13   structured, productive?  Because as we know and as the Court

14   knows doing a lot of sentencing proceedings, we look to that to

15   find out whether or not there's going to be some kind of

16   recidivism.  If the person does not have a structured,

17   productive life, normally they go out and do other things.  In

18   this situation, he is a very structured, productive,

19   disciplined person, unlike probably many other people I've

20   seen.

21             He did not earn any significant income for his

22   criminal conduct.  Of course, that's not an element, that's not

23   what the government has to prove, but it is something that

24   courts look at.  For example, if he had earned $500,000 or

25   $100,000, or whatever the case may be, then we would be saying,

1    well, he earned this amount of money, so we know he profited,

2    and therefore, that goes towards sentence.  He didn't do that

3    here, and that's not the case.  Quite frankly, he didn't earn a

4    penny, from what I understand.

5           Mr. Makashvili has already lost significant economic

6    opportunity and future earnings as a result of this criminal

7    conduct.  Why is that important?  When he first got arrested

8    last year in June, I believe in August he was scheduled or

9    September he was scheduled for a world championship fight in

10   Georgia or Russia, I believe, where that fight would have

11   catapulted him to the world championship fight.  Of course,

12   because of his conduct, I'm not saying anyone else, because of

13   his conduct, he was not able to do that.  Subsequent to that,

14   several other contracts came through for Mr. Makashvili from

15   the fight and other fights where he could have continued his

16   ascension up the ranks.  Couldn't do those either.

17          So I think the Court talked about this when we tried

18   to get -- ask him to be allowed to travel.  It was important to

19   note that fighters, athletes, have shelf lives.  I know that.

20   I was a former athlete.  We got shelf lives.  Got to take the

21   opportunity when it comes because if it doesn't, you will miss

22   it.  His shelf life is about over, almost over.  So he's missed

23   out on three or four championship-caliber fights.  I believe

24   he's scheduled for another one in October, this October, of

25   course if he's out and can travel.  So he has given up a lot,

1    and he has been punished a lot.  So we must look at every

2    defendant individually about how they are and how the crime

3    impacts them individually.  In this individual's situation, his

4    collateral consequences are significant.

5            We talked about and the Court noted how long he was

6    involved, May 2016, but it was intermittent, as I like to say,

7    May 2016, again a little later than that, then not too much and

8    then again at the end part of it.  That's important, I think,

9    because it wasn't a consistent strand or continuity of

10   involvement.

11           Finally, it's important to note that Mr. Makashvili is

12   subject to deportation.  That's probably one of the most

13   important aspects of it.  You know, it is a zero to five

14   maximum.  Normally, I'm saying normally, deportation may not

15   happen, but it may.  He has been advised that it may very well

16   happen because of the circumstances and the atmosphere that

17   we're in right now.  He may very well be deported.  He's aware

18   of that.  He was aware of that before he took the plea, so

19   that's important as well.

20           So for those reasons, we sincerely believe that he is

21   not a danger to the community.  He is not someone that I

22   believe should be sentenced to incarceration, notwithstanding

23   this last hiccup, whether or not this lack most recent contact

24   elevates him from probation to, say, I don't know, house arrest

25   plus probation, I don't know, but I really do not believe that

I8OHMakS

all criminal conduct should result in jail.  I just don't

believe that.  I don't believe that every person that's

convicted of a crime should go to jail.  I don't believe that.

I don't believe Congress believes that.  I don't believe that

certain state legislators believe that.  In fact, since

Congress said zero to five, that must mean that there is a

circumstance where a person that's charged and convicted of

this particular crime, Congress believes that they can get

zero.  I can't imagine how a person like Mr. Makashvili, who's

a first offender, nonviolent, minor participant, working,

structured, family man, focused, disciplined, etc., is not the

type of person that Congress thought, when convicted of this

crime, can't get zero.  I don't know what other factor that

would be used to promote a zero other than that.

So for those reasons, I think that Mr. Makashvili is a

prime candidate for a non-incarceratory sentence.  I agree that

the recent contact with law enforcement should cause us pause.

I agree that Mr. Makashvili should resolve that matter and

should receive, I guess, something more than saying don't do

it, but I do not believe it should warrant any type of

incarceration.  The guidelines is zero to six months.  A

probationary term falls squarely within that, and I think

that's the appropriate and just sentence for Mr. Makashvili.

If the Court has any questions for me -- oh, last

thing.  Your Honor doesn't know this, but I do quote your Honor

1   quite often in my sentencing submissions, and you said to me

2   one time a long time ago in a case that a client was facing

3   prison time, and I believe the words were:  Mr. Donaldson,

4   sometimes a person would rather have some jail time than face

5   the collateral consequences of having a felony conviction.

6   They would rather trade that sometimes, and I agree with that.

7   Sometimes if I can have -- if it was up to me and I had the

8   choice between taking a two, three months in jail or having a

9   lifelong stigma of a felony conviction where I can't do

10  anything with it, I might take that jail rather than those

11  collateral consequences.  In this situation, it might be the

12  opposite.  I can't imagine how jail for Mr. Makashvili would

13  serve any purpose, any purpose at all, except that it would

14  fill a jail cell for a little while and, two, it will prevent

15  him from securing that possible championship belt that will

16  provide some kind of economic resource for his family for the

17  rest of their life.  Other than that, respectfully, I don't

18  know what a jail sentence would do.

19          Personal deterrence, the collateral consequences that

20  he's faced and will continue to face, I think, will serve as a

21  significant personal deterrence, in my humble opinion.

22          With that, I'll stand down.  If the Court has any

23  questions, I'll be happy to answer them.

24          THE COURT:  All right.  Thank you, Mr. Donaldson.  I

25  don't have any additional questions at the moment.

I8OHMakS

1          Mr. Makashvili, would you like to address the Court

2     before sentence is imposed?

3          THE DEFENDANT:  (In English) I want to just say sorry.

4          THE COURT:  OK.  Thank you.  Thank you.

5          Anything else that you would like to say?  There's no

6     obligation to speak.  I just invite you to speak.  You're

7     always entitled to speak and have a right to speak.

8          THE DEFENDANT:  (In English) I want to say something.

9     I love this country.  When I left my -- I don't know.  I want

10    to say sorry, you know.

11         THE COURT:  All right.  Thank you.  Thank you.

12         Let me describe how I reach a sentencing

13    determination.  Here, even though this particular crime does

14    not carry high guidelines, I am required to reference the

15    guidelines in any event, and I have reviewed the guidelines

16    here and am mindful of them.

17         The guidelines here for an offense level of eight and

18    a criminal history category of I are zero to six months.  I

19    note that in particular because there is an error in the

20    probation report where there's an indication on page 19 that

21    the guidelines are zero to eight months, and they're not.  They

22    are zero to six months, and that's on page 19.  The guidelines

23    are correctly referenced in the plea agreement, and I think we

24    have all been assuming and working along the lines of a

25    guidelines range of zero to six months.

1          In all events, the guidelines are advisory only.  What

2    I have to do for every individual is to determine whether the

3    guidelines suggest a reasonable range and also as part of my

4    review of the guidelines to look at different ways in which

5    sentences may be structured and to be certain that I've taken

6    into consideration all of the various possibilities of types of

7    sentences that could achieve the various sentencing purposes

8    set forth in 3553(a).

9          For every defendant, including you, Mr. Makashvili,

10   what the Court does is the Court tries to determine and seeks

11   to determine what is a sufficient, but not greater than

12   necessary, sentence for you for the crime of conviction.  Here,

13   the crime of conviction is a crime which is, in large part,

14   about being a facilitator of others, here through driving

15   and/or accompanying an individual, Mr. Shulaya here, who was --

16   that other individual engaged in far more serious criminal

17   conduct.  There's no doubt, Mr. Shulaya has been tried and

18   convicted of some very serious crimes, that Mr. Shulaya was

19   involved in a whole array of criminal behavior.  One type of

20   behavior that he was involved in had to do with illegal

21   gambling, and the crime of conviction here for you,

22   Mr. Makashvili, is some form of involvement with that.

23         Now, your guidelines are very low because your level

24   and the nature and the type of involvement is far less than it

25   is for others.  So I take into account the fact that what the

29

I8OHMakS

1    crime of conviction is here, it's a serious crime, but it's not

2    nearly as egregious in terms of the type of crime, the nature

3    of the crime, the nature of the conduct, as others who are

4    involved somehow in some way with the Shulaya enterprise.

5    Nevertheless, every individual who is involved with the

6    enterprise, including yourself, was facilitating it in some

7    way.  It's important not to overstate an individual's

8    contribution to that facilitation and to keep in mind what they

9    were and what they were not doing, and I do that for you here.

10        I do acknowledge that you are a first-time offender, a

11   nonviolent offender, that you were not a leader.  All of those

12   things are already taken into account with the guidelines.  One

13   issue that I have currently with what probation has been doing

14   very recently is probation has been, on the one hand,

15   exercising discretion in their recommendations, which I

16   applaud; on the other hand, they have been doing it in a manner

17   that I think needs to be adjusted.  They have been justifying

18   variances, as they did here, that are based upon the very same

19   factors that are already embedded into the guidelines.  So in

20   other words, here, nonviolent offender, that's already

21   considered in the guidelines.  First-time offender, already

22   considered in the guidelines.  Type of conduct, already

23   considered in the guidelines.

24        What would be more helpful to the Court would be how

25   and why, understanding all of those things and having a

1    guidelines range suggestive of a particular possible sentence

2    or different ways in which a sentence could be structured, why

3    a defendant should, nonetheless, get a variance.  There is a

4    possibility with the guidelines of there being zero, and so

5    it's not actually so much of a variance as suggestive that this

6    defendant fits at the very lowest end of that.  But I don't

7    have much to go on from what probation said other than what's

8    already embedded in the guidelines.

9         At the end of the day, it's neither here nor there,

10   ultimately, because I always reference what probation has done.

11   I think about it, but I decide myself what should be done.  I

12   am most concerned here with Mr. Makashvili's, what I would

13   call, involvement in the vicinity of illegal activity in ways

14   that are not perhaps totally understood, but he has been

15   involving himself over time with Mr. Shulaya.  It was

16   intermittent, Mr. Donaldson, as you have said, but that itself

17   is concerning because it suggests that he was involved, he

18   stopped, he went back to it when he came back after his foreign

19   travel.  So it was intermittent but demonstrating a willingness

20   to go back to it.

21        It is hard for the Court to believe, and indeed I do

22   not believe, that anybody could have been a driver for

23   Mr. Shulaya and not understood that there was a whole host of

24   illegal activity happening because, indeed, it appears that

25   Mr. Shulaya's entire existence was involved in a -- touching a

1    variety of types of illegal activity, including the gambling.

2    So getting anywhere near it, given the concerns with a career

3    and how a deprivation of liberty could impact Mr. Makashvili's

4    career, how that all could play out, is concerning.

5          So I have the conduct; then I have an individual who

6    committed the conduct in a way that was knowing; and in terms

7    of what he, Mr. Makashvili, was doing, that was persistent over

8    at least some period of time and was supportive and,

9    ultimately, facilitated illegal conduct.

10         So that brings me to who he is.  And I do acknowledge

11   that he is an individual who makes his living through athletic

12   endeavors, and there's a limited shelf life, as Mr. Donaldson

13   has said; that he is a family man, and that's reflected in the

14   PSR; and that there are many, many individuals who have far

15   less going for them than Mr. Makashvili.

16         However, I am concerned.  I'm very concerned by what

17   occurred in August of 2018 after Mr. Makashvili was able to

18   obtain what is an extraordinarily favorable plea agreement that

19   caps his potential exposure in the way it does and has a

20   guidelines level as low as it is to have been involved again in

21   the vicinity of some form of unlawful activity, which is

22   obtaining a plate from who knows where, but it's a Florida

23   plate, putting it on a vehicle.  This is the kind of thing that

24   really concerns me.  There are a number of inferences that

25   could be drawn from it, but what I am concerned with is that

1     Mr. Makashvili has not until now fully taken on board the

2     serious consequences that flow from engagement in unlawful

3     behavior and that there is a need for some sentence, albeit a

4     limited sentence, that will serve the purpose of personal

5     deterrence.

6              As you folks know, what the Court does is it tries to

7     determine for every sentence whether any personal deterrent

8     effect is needed, personal deterrence, general deterrence; what

9     kind of sentence will promote respect for the law; what kind of

10    sentence will be a just sentence; whether there are any

11    educational, vocational, correctional, or other treatment that

12    is suggested by a particular sentence; and, of course, taking

13    into account any mitigating factors.  So it is my view that the

14    most recent series of events that occurred in August of 2018

15    demonstrate a need for personal deterrence, and it is for that

16    reason that the sentence that I will impose today will be a

17    sentence that both acknowledges the seriousness of the crime,

18    the duration of the conduct, the fact that it was returned to

19    intermittently but demonstrating a willingness and desire to

20    return into that universe, and will be therefore a just

21    sentence reflecting all of the necessary sentencing purposes.

22             So under all of the factors of 3553(a), it is my

23    determination that the defendant should be sentenced to a

24    period of incarceration of six months.  I will allow him to

25    self-surrender.  So we'll talk about that in a moment.

I8OHMakS

1      In addition to that, he will be on supervised release

2  for a period of three years.  That period of supervised release

3  will allow probation to monitor the defendant, his movements

4  here in the United States, should he be allowed to remain in

5  the United States, and to ensure that he both seeks full-time

6  employment and otherwise stays on the right side of the law.

7      There will be certain terms and conditions associated

8  with the period of supervised release, which I'll go through

9  right now.  There will be some standard conditions and there

10 will be the following mandatory conditions:

11     You shall cooperate in the collection of DNA.

12     You shall not possess a firearm or other destructive

13 device.

14     You shall not commit another federal, state, or local

15 crime.

16     You shall not illegally possess a controlled

17 substance, and you shall be tested randomly at least two times

18 to determine whether or not you are using a controlled

19 substance.  If you are, then you shall be tested more

20 frequently thereafter.

21     You shall submit your person, residence, place of

22 business, vehicle, and any premises otherwise under your

23 control or in which you are living to reasonable searches as

24 reasonably requested by probation.

25     You are to seek and maintain full-time employment

I8OHMakS

1  should you have a visa status that allows you to do so.

2          You shall obey all immigration laws and directives of

3  the U.S. immigration authorities.

4          You shall report to the nearest probation office

5  within 72 hours of your release from custody.

6          And you shall be supervised in your district of

7  residence.

8          There will be a $100 mandatory special assessment

9  which I impose and do impose.

10         I don't find that you have sufficient resources to pay

11  a fine, and so I am not going to impose a fine.

12         And there's no provision for forfeiture or restitution

13  here, so those are not imposed.

14         Is there any legal or other reason why sentence should

15  not be imposed as stated?

16         MR. THOMAS:  Not to the government's knowledge, your

17  Honor.

18         THE COURT:  Mr. Donaldson?

19         MR. DONALDSON:  No, your Honor.

20         THE COURT:  The Court does impose sentence as stated.

21  I'll get to the other applications in just a moment, but let me

22  make sure I sort of close this out.

23         Are there any open counts?

24         MR. THOMAS:  There's an underlying indictment.  The

25  government moves to dismiss it.

I8OHMakS

THE COURT:  The Court does dismiss the underlying indictment.

Now, during your plea, Mr. Makashvili, you gave up a number of appeal rights, but it's not the Court's place to tell you whether or not you have any appeal rights.  It is my duty to tell you that should you want to file an appeal, you must file any notice of appeal within 14 days of the filing of the judgment of conviction.  If you cannot afford the cost of appeal, you can apply to have those costs waived.  That's called proceeding *in forma pauperis*, and you have a right to apply to proceed in that manner.

Now, I did say that I will allow the defendant to self-surrender.  I say that with some concern because I think there is a possibility of flight given that, previous to today, he was not aware and perhaps not even counting on any kind of incarceratory sentence, and so his incentives for flight may be altered at this point in time.  But at this point I don't *sua sponte*, unless the government has an application, feel the need to do anything differently.

Let me ask the government, do you have any view that the defendant should not be allowed to self-surrender?

MR. THOMAS:  No, your Honor.  The government's fine with probation's recommendation.

THE COURT:  So we will allow the defendant to self-surrender.  What I typically do is I usually,

I8OHMakS

1    Mr. Donaldson, allow self-surrender for a period anywhere up to

2    six weeks.  We can do the maximum time, which would be six

3    weeks from now, or we can do something sooner to get the

4    sentence underway.  What would you prefer?

5            MR. DONALDSON:  I would prefer six weeks, your Honor.

6            THE COURT:  So the date for self-surrender shall be

7    October 5, 2018.  The defendant shall surrender to the custody

8    of the U.S. marshals here in this building if a facility has

9    not already been designated for him.  Because of the shortness

10   of the sentence, it may be that the defendant will remain in

11   the New York City area and/or over at one of the facilities

12   nearby, so he may not be designated any place.  But in all

13   events, by October 5, 2018 -- did I say 11 a.m.?

14           MR. DONALDSON:  You did not.

15           THE COURT:  At 11 a.m. he should surrender to the

16   marshals in this building or to his facility.

17           Now, are there any other applications?  Mr. Donaldson,

18   I think you had something.

19           MR. DONALDSON:  No, I did not, your Honor.  I was

20   going to talk about the voluntary surrender.  I presume there

21   is no conceivable way at this point I can convince the Court to

22   reconsider that six months and go to three months?

23           THE COURT:  I believe that six months is a sufficient,

24   but not greater than necessary, sentence for this defendant

25   given the series of events to adequately ensure personal

I8OHMakS

1    deterrence, and that is the primary reason for my coming up

2    with an incarceratory sentence and a sentence of that duration.

3    So I guess the answer is no.

4            All right.  If there's nothing further, then we are

5    adjourned.  Thank you.

6            (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25